[No. A069988. First Dist., Div. Five. Apr. 3, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
AMEER RASHID WEAVER, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.B.

155

## COUNSEL

Patricia N. Cooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Doug MacMaster, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**PETERSON, P. J.**—Ameer Rashid Weaver appeals from a judgment entered after he pleaded guilty to second degree murder (Pen. Code,[1] § 187) and admitted a firearm use enhancement (§ 12022.5, subd. (a)). He claims the judgment must be reversed because (1) section 1538.5, subdivision (j), under which the prosecutor was granted a de novo hearing on a previously successful suppression motion, is unconstitutional; and (2) the trial court erred when it denied his motion to suppress. We reject both arguments and will affirm.

### I. Factual and Procedural Background

Appellant admitted murdering Maurice Campbell. His codefendants, Lavonce George Yeargin and David Jonathan Hamm, pleaded guilty to lesser charges.

The murder arose from a dispute over a drug debt. The victim, Campbell, his girlfriend, Bennie Alexander, and a third person, George Hill, lived together in an apartment in San Pablo. On June 13, 1994, Hamm and another man went to the apartment to encourage Hill to pay his drug debt. After they left, Hill noticed his apartment key was missing.

Later that evening, Campbell and Alexander were in the apartment when they heard a key in the front door. The door swung open, and Alexander saw Hamm standing in the doorway. He asked if Hill was present. Suddenly another man, whom Alexander did not see but who was later identified as appellant, rushed through the door and shot Campbell three times, killing him.

Several neighbors provided information to help identify the culprits. Kimberly Burton said she heard three shots and saw three men jumping over the apartment's fence. Frank Short also heard shots and saw two men run from the area. He followed them and saw one climb over a fence and cut his hand on some barbed wire. The men continued into a creek area, where Short lost them. Billy Burton heard shots and saw two or three men run past her, one of them possibly carrying a gun. She recognized one of them as Hamm, and believed the other was named Cedric. She said she had seen both of them at the victim's apartment earlier that day. Using a photo lineup, Burton identified the men as David Hamm and Cedric Williams.

Based on this evidence, Sergeant James Hatchell of the Contra Costa County Sheriff's Department obtained arrest warrants for Williams and

---

[1] All subsequent statutory references are to the Penal Code.

Hamm. Williams came to the sheriff's office voluntarily on June 23, 1994, to discuss the crime. The interview was captured on videotape and was viewed by the trial court before it ruled on the motion to suppress. We set forth the pertinent portions below.

Williams initially told Hatchell that he went with Hamm and a third person to Hill's apartment around noon on the day of the crime to collect some money. An argument ensued during which Hamm threatened Hill. The trio then left. Williams denied returning to Hill's apartment later that day, and he denied any further knowledge of the murder.

At that point in the discussion, Hatchell brought in another deputy to handcuff Williams and take him to jail. Williams suddenly stated, "All right, I'll tell you who did it, man. I'll tell you who did it right now." Williams then relayed the rest of what he knew.

Several hours after the initial incident at Hill's apartment, Williams spoke with appellant, Yeargin, and Hamm, outside of Hamm's apartment. Appellant said they were going to beat up Hill, and he asked Williams if he wanted to come along. Williams declined. Hamm and Williams then went inside Hamm's apartment where Hamm retrieved a rifle. Williams asked whether they were going to shoot Hill. Hamm said no. Hamm, Yeargin, and appellant then drove off in Yeargin's car leaving Williams behind.

About 15 minutes later, Williams saw Yeargin drive up alone. He drove off and then returned about five minutes later with appellant and Hamm. When all three got out, Williams noticed Hamm was covered with blood. Yeargin and appellant left, so Williams was able to speak with Hamm alone. He said when they went over to Hill's apartment, appellant "just started blasting." They then fled. While climbing over a fence, Hamm cut his hand on some barbed wire. Appellant fled through a creek.

Williams told Hatchell that in the days following the murder, appellant had threatened his life repeatedly. He also said that the day before the interview, he had heard Yeargin and Hamm say they had taken a gun to Hayward.

Williams's girlfriend corroborated that Williams was not present during the murder. Hatchell also learned that an anonymous citizen had called the police and said that "Cedric, Hamm, and [appellant]" were responsible for the murder.

On June 24, 1994, the authorities saw appellant, Yeargin, and Hamm in Yeargin's car and arrested them. They briefly searched the car, but found no

evidence and decided to impound it. Hatchell believed the car would contain trace evidence of fibers, soils, and blood and he wanted to search it. However, Hatchell had to transfer the case to Sergeant Raymond Ingersoll due to a regularly scheduled work rotation. Ingersoll spoke with Hatchell and with a representative from the district attorney's office, and decided to search the car without a warrant. He asked a crime scene investigator to process the car. She did so on June 28 and 29, 1994. In the trunk, she found a bloody sweatshirt. In a box in the trunk that could be accessed from the backseat, she found a 30/30 rifle with a box of bullets taped to it. The rifle was identified as the murder weapon.

On July 9, 1994, appellant admitted murdering Campbell. He said he first shot Campbell in the arm, then in the side, and then a final (and presumably fatal) shot to the head.

Based on these facts, a complaint was filed charging appellant, Hamm, and Yeargin with murder. Midway through the preliminary hearing, appellant moved to suppress the evidence that had been seized from Yeargin's car. The magistrate granted the motion, but held appellant, Yeargin, and Hamm to answer.

The People then filed a request to relitigate the suppression motion de novo in the superior court as is permitted by section 1538.5, subdivision (j).[2] The court conducted a de novo hearing and rejected the motion to suppress.

On April 24, 1995, appellant pleaded guilty to second degree murder and admitted the firearm enhancement. After the court sentenced appellant to 19 years to life in prison, he filed the present appeal.

II. DISCUSSION

A. *Constitutionality of Section 1538.5, Subdivision (j)*

■ Appellant challenges the constitutionality of section 1538.5, subdivision (j). He notes that under section 1538.5, subdivision (i), a defendant who files a motion to suppress in a preliminary hearing but who is unsuccessful may renew the motion in the superior court, but the review is limited

---

[2]Section 1538.5, subdivision (j) states, in part, "If the property or evidence relates to a felony offense initiated by complaint and the defendant's motion for the return or suppression of the property or evidence at the preliminary hearing is granted, and if the defendant is held to answer at the preliminary hearing, the ruling at the preliminary hearing shall be binding upon the [P]eople unless . . . the [P]eople, within 15 days after the preliminary hearing, request in the superior court a special hearing, in which case the validity of the search or seizure shall be relitigated de novo on the basis of the evidence presented at the special hearing . . . ."

to "the transcript of the preliminary hearing and to evidence that could not reasonably have been presented at the preliminary hearing, except that the [P]eople may recall witnesses who testified . . . ." By contrast, the People can, in analogous circumstances, obtain a de novo hearing of a suppression motion under section 1538.5, subdivision (j). Appellant contends section 1538.5, subdivision (j) violates due process and is unconstitutional because it grants to the People a right defendants do not have under section 1538.5, subdivision (i), and gives the prosecution an unfair advantage.

Our Supreme Court rejected a similar argument in *People* v. *Hansel* (1992) 1 Cal.4th 1211 [4 Cal.Rptr.2d 888, 824 P.2d 694] (*Hansel*), where the issue was the constitutionality of that portion of section 1538.5, subdivision (i) which grants the People, but not the defendant, the unqualified right to recall witnesses at the special hearing in the superior court. Like appellant here, the defendants in *Hansel* argued the section violated due process because it denied them the same substantive and procedural advantages granted to the People, and because it impermissibly tilted the balance of forces toward the prosecution. The Supreme Court rejected both these arguments unanimously. The court explained that the mere fact the prosecutor and defense were given different procedural rights at the suppression hearing did not violate due process because defendants were still allowed to litigate their suppression claim fully: "[T]he prosecution's statutory right to recall witnesses does not prevent defendants from either acquiring or presenting any evidence they may need to defend themselves effectively. Defendants may still receive a full and fair hearing on the admissibility of the evidence. There is nothing fundamentally unfair in failing to permit the defendant the same right to recall witnesses at the superior court hearing as is given the prosecution. [Citation.] Defendants' mere mechanical repetition of the word 'reciprocity' is not enough to show that their right to a fair hearing would be violated." (1 Cal.4th at p. 1221.) The *Hansel* court also rejected the argument that the statute granted the prosecution an unfair advantage. "In seeking the suppression of evidence, the defendant may choose to litigate fully the validity of the search or seizure in question either at the preliminary hearing or in the superior court. The defendant has an advantage at the preliminary hearing since the section does not require the accused to give the prosecution notice of the motion or to present a formal written motion. At the second hearing in the superior court, the defendant may present a better researched and written motion. These procedural advantages given to the defendant may be offset to some extent by the People's ability to recall witnesses who testified at the preliminary hearing. However, the defendant is not really disadvantaged, since any recalled witnesses will be subject to cross-examination and, presumably, any inconsistencies in their testimony will be exposed." (*Id.* at p. 1222.) Thus, the *Hansel* court rejected

the constitutional challenge, stating: "these procedures, taken as a whole, do not tilt the balance toward the state to any significant degree. Although the procedures available to the defendant do not precisely mirror those available to the prosecution, defendants are given a full and fair opportunity to present their claims at the suppression hearings. For these reasons, we conclude the challenged provisions of section 1538.5, subdivision (i) do not violate due process." (*Ibid.*)

These same considerations lead us to conclude section 1538.5, subdivision (j) is constitutional. While it is true the section grants to the People a right to which defendants are not entitled, the right to a de novo hearing in the superior court, it is equally true that nothing in that section prevents a defendant from fully pursuing his motion to suppress in the superior court. The applicable language does not limit the type of evidence a defendant may offer at the de novo hearing, nor does it grant to the prosecution any procedural right the defendant does not possess. Indeed, it is the defendant who is granted an additional right, as he alone is entitled "to a continuance of the special hearing for a period of time up to 30 days." (§ 1538.5, subd. (j).)

Nor do we believe the section grants the prosecution an undue advantage. Appellant's theory is that since the prosecution has heard a defendant's suppression arguments at the preliminary hearing, it can tailor its evidence and arguments in the superior court in an attempt to defeat the motion. While this may be true, a defendant who asserts a motion to suppress at a preliminary hearing also has a significant advantage because he is "not requir[ed] . . . to give the prosecution notice of the motion or to present a formal written motion." (*Hansel, supra,* 1 Cal.4th at p. 1222.) As a result, a defendant can surprise a prosecutor by making a motion she may not have anticipated and, thus, force the prosecutor to divide her attentions and possibly present a weaker argument against suppression. To some extent, that is what occurred in this case. Appellant made his motion without prior notice and, thus, forced the prosecutor to address the issue while simultaneously litigating a complex preliminary hearing involving three defendants. The Legislature could, and impliedly did, attempt to offset this "surprise" advantage by granting the prosecutor the right to litigate the issue de novo in the superior court and, thus, ensure that search and seizure motions are decided carefully and completely. We see nothing intrinsically unfair about this procedure. We conclude section 1538.5, subdivision (j) does not violate due process.

B. *Whether the Court Properly Denied the Motion to Suppress**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. DISPOSITION

The judgment is affirmed.

King, J., and Haning, J., concurred.

A petition for a rehearing was denied April 25, 1996, and appellant's petition for review by the Supreme Court was denied July 10, 1996.

*See footnote, *ante*, page 154.